M. A. DUNCAN, *Appellee*, v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant.*

No. 18,340.

SYLLABUS BY THE COURT.

NEGLIGENCE—*Personal Injuries—Findings of Jury Supported by Evidence.* Upon the facts stated in the opinion it is held that a finding that deceased, in the performance of his duties as head brakeman, stepped from a moving freight train, that he was exercising ordinary care at the time, and that his death was caused by the negligence of the defendant railway company, was not based upon mere speculation nor drawn from facts or conditions imagined or assumed.

Appeal from Sumner district court. Opinion filed July 5, 1913. Affirmed.

*William R. Smith, Owen J. Wood,* and *Alfred A. Scott,* all of Topeka, for the appellant.

*Ed. T. Hackney,* of Wellington, for the appellee.

The opinion of the court was delivered by

PORTER, J.: The plaintiff recovered a judgment against the defendant for $8000 damages for the death of her husband, F. E. Duncan, while in defendant's employ as brakeman of a freight train. The accident occurred on the night of March 9, 1908, about eleven o'clock. Duncan was head brakeman of a freight train coming east through the station of Noel, Okla., where

24—90 KAN.

Duncan v. Railway Co.

there was a switch leading to an elevator on the south side of the track and a switch stand on the north side. Seventy-eight feet east of the switch stand there was a bridge fifty-six feet in length over a ravine. The north side of this bridge was provided with a plank runway and hand rail, so that brakemen could get down from that side in safety. On the south side there was no runway or hand rail, the ends of the ties being eighteen inches from the south rail. The train consisted of about twenty-five empty cars and was drawn by two engines. Two cars in the rear of the train were to be cut out and set upon the switch. Duncan was standing in the gangway of the second engine, with a lantern in his hand, passing signals from the rear of the train to the engineer of the head engine, who controlled the movements of the train. He was seen by his engineer to be falling from the bridge as the second engine crossed it and was found unconscious in the roadway beneath, and died next day from his injuries.

This is the second appeal of this case (86 Kan. 112), the first judgment in favor of plaintiff having been re-versed and a new trial ordered on account of error in the admission of testimony, and for the further reason that the known facts and circumstances shown in the evidence were not, in the opinion of the court, of such a nature and so related one to another as to justify the jury in their conclusions as to the manner in which Duncan met his death and the cause thereof. The case has been retried on the same pleadings and substantially upon the same evidence. The petition sets up two claims of negligence, both of which were relied upon at the first trial, a defective engine step and failure to have a runway and hand rail on the south side of the bridge. It is alleged in the petition that Duncan "either attempted to step to the ground or to take a position on the steps of the engine" and fell through the bridge. The jury at the former trial made a finding that the deceased fell out of the gangway and that the

Duncan v. Railway Co.

cause of his death was a defective step and lack of runway and hand rail. At the second trial the claim of negligence by reason of a defective engine step was abandoned, the only negligence relied upon being the failure to provide a flooring or runway and hand rail on the south side of the bridge. The jury find this negligence to have been the cause of Duncan's death; that the bridge in question was not a standard bridge as approved and adopted by the defendant and railway companies generally; that Duncan had been over this bridge twenty-eight times while acting as fireman, and twenty-seven times while serving as a brakeman; that he would not have been injured if he had remained on top of his train or had waited until the train stopped before getting off; that he knew there was no runway on the south side of the bridge. They expressly find that he did not fall out of the gangway or from the engine and that he was not required by any emergency to go from the engine to the rear of the train to assist in switching the cars. They find that he was not attempting to get down for the purpose of throwing the switch; that the urgent reason for him to get off in the dark before the train stopped was to cut off the two rear cars, and that the conductor and rear brakeman were not at the rear of the train preparing to perform that duty.

The only person who knew anything about how the accident occurred was W. H. Wright, the engineer of the second engine. He testified:

"I saw him just prior to the injury. He was on the engine that I was running. He was taking signals from the rear men and giving them to the head engineer. It was about 11 o'clock P. M. The signals were being given from the south side and Mr. Duncan was receiving them from the south side. The last I saw of him he was standing in the gangway. Something called my attention inside of the engine. When I looked back next he was lying lengthways on the bridge for a second, the next second he disappeared. Just as soon as I saw that, I whistled the head man down. As soon

as he stopped I told the head man what had happened and went down there and found him lying in the middle of the road. . . . When I caught sight of Mr. Duncan lying on the bridge for a second he was lying with his feet to the east and head to the west. The train was moving about four or five miles an hour when Mr. Duncan was injured."

The plaintiff claims that some additional evidence was produced at the second trial which in connection with the other facts and circumstances shown was sufficient to justify a finding that Duncan attempted to step from the engine to the ground for the purpose of assisting in switching the train by uncoupling the two rear cars, and that by reason of the absence of any protection upon that side of the bridge he fell through it. George McCarty, the rear brakeman, in answer to a question asked by the defendant said that Duncan stepped off. When asked how he knew that fact he answered:

"Engineer Wright came back and met us and said the brakeman got off on that bridge and got hurt. I don't remember exactly whether he said that he fell off or that he got off."

This was hearsay evidence of an opinion said to have been expressed by the engineer who himself testified that just before the accident his attention was called to his duties inside the cab and that the first he knew or saw of the accident was when he noticed Duncan falling from the bridge.

There was a direct conflict in the evidence in reference to the duties of the head brakeman at the time and place. The head engineer testified:

"After we get over the switch the conductor throws the switch, backs in on the siding and cuts off the cars. The rear brakeman flags to protect the rear end of the train. The front brakeman gives signals, takes signals from the conductor and passes them to me. The best place for him to receive and see these signals is where he can be seen from both the head and the rear end and that is ordinarily on the top of the train. At that place,

where the train was straight, situated as that was, the signal could be seen from the top better than from anywhere else.    That is where the rule required him to be. . . .   I got the signals from the rear end. . . . The front brakeman did not have any duty to perform that took him off the train at that place at the time this accident occurred.   No one outside of the conductor and rear brakeman had any duty to perform with reference to cutting off those two cars and pulling them in on the switch. . . .   There was no emergency there. There was no occasion for unusual hurry to complete the work there or any instructions to hurry.   It was an ordinary freight train making an ordinary trip."

The rear brakeman, the conductor and all the men employed on the train testified in positive terms that the head brakeman had no duty of any kind to perform in connection with the work of cutting out the two cars except to remain on the top of the train giving and passing signals.   On the other hand, plaintiff produced three witnesses, former railway employees, who testified that it would be the duty of the head brakeman to uncouple the two cars and to do that would require him to get down from the train while it was in motion and as near as he could estimate the place where the cars that were to be cut out would stop.   The defendant produced as a witness its general foreman of bridges who had 36 years' experience in building bridges and had charge of the erection, of details, bills for materials, and supervision of all bridges on that division, who testified that he was familiar with the bridge in question and that it was a standard bridge, such as was approved and accepted by railroad companies generally. Will Pitts, brakeman, formerly in the employ of the defendant, testified that defendant's bridges, inside yards and adjacent thereto where cars were switched, were constructed usually with runways on both sides. The court instructed as follows:

"If the bridge in question was of standard make and such as was approved and used by defendant and railway companies in general for the purposes and under

like circumstances that this bridge was used by the defendant, the plaintiff can not recover." .

To a special question asked by the defendant the jury answered that this bridge was not such as was approved and adopted by the defendant and railway companies generally. This finding must be construed in connection with the instruction which defined a standard bridge as one adopted and in general use by the defendant and railways in general "for the purposes and under like circumstances that this bridge was used by the defendant," and this, we think, is the vital point in the case. The defendant limited its proof and failed to show that the bridge was constructed in the same manner as those generally adopted which are adjacent to yards or places where cars are to be uncoupled and switching done. There was, as observed, a direct conflict in the evidence respecting the duties of a head brakeman when switching is required at stations. It is inconceivable that railway men of experience could honestly differ in their understanding of such important matters; and the conflict can not be reconciled except upon the theory that for some reason one set of witnesses have not told the truth. The jury saw fit to believe the witnesses of the plaintiff and we are bound by their verdict. While the evidence is not at all clear as to the exact cause of Duncan's death, and does not clearly show whether he fell from the gangway or attempted to step down to the ground and failed to remember that the bridge was there, and by reason of the absence of a runway and hand rail fell through the bridge, nevertheless we are inclined to believe that when the jury determined from the evidence that his duties required him to get off the train at or near the bridge it can not be said to have based its verdict upon mere speculation, nor to have drawn an unreasonable inference in finding that his death was caused by the negligence of the defendant. Whether or not he was

Griffin v. Brick Co.

guilty of contributory negligence in failing to remember the location of the bridge was a question for the jury. (*Rouse v. Ledbetter,* 56 Kan. 348, 43 Pac. 249; *Edwards v. Railroad Co.,* ante, p. 183.)

The judgment is affirmed.